ELIZABETH M. COOK, AN INFANT, ETC., RESPONDENT AND APPELLANT, *v.* ALEXANDER M. LOWRY, APPELLANT AND RESPONDENT, IMPLEADED WITH OTHERS.

*Invalid direction for accumulations — the same rule applies to undisposed of income of personal as to that of real property — R. S., part 2, chap. 1, tit. 2, art. 1, sec. 40, and chap. 4, tit. 4, sec. 2 — Accounting by a trustee — allowances of payments claimed to have been made by him — when he will be charged with interest at seven per cent with annual rests — how his commissions are to be computed.*

Section 40 of article 1 of title 2 of chapter 1 of part 2 of the Revised Statutes (1 R. S., 726), providing that where there shall be a suspense of the power of alienation or of ownership, during the continuance of which the rents and profits shall be undisposed of, and no valid direction for their accumulation shall be given, they shall belong to the persons presumptively entitled to the next eventual estate, is, by virtue of section 2 of title 4 of chapter 4 of part 2 of the Revised Statutes (2 R. S., 773), made applicable to cases in which an unlawful accumulation of the interest and income of personal property has been directed.

A testator died in 1852, leaving an estate consisting of both real and personal property. After giving several minor legacies he gave an annuity of $100 to Therina Hall, and the interest of $2,000 a year to Lydia Hall. He then gave one-fourth part of all the rest and residue of his estate to each of his three sons. He directed that the remaining fourth part and the income thereof should be invested by his executors during the natural life of his only daughter Georgiana, except that the income of $25,000 thereof should be paid to her semi-annually; and in case of her death without issue the said fourth part was given to the testator's said sons in equal shares, but if she died leaving lawful issue then said fourth was given to such issue. Georgiana, who was about fourteen years old when her father died, married in 1855. On March 25, 1857, the plaintiff, who is the sole issue of the said marriage, was born.

*Held,* that the direction for the accumulations of the income of so much of the fourth part as exceeded $25,000 was invalid, and that the plaintiff from the time of her birth was entitled to receive the same.

That upon the death of Therina Hall one-fourth of the capital sum, to the income of which she was entitled during her life, fell into the trust fund.

In 1865 the executors, one of whom was one of the sons of the testator, commenced proceedings before the surrogate, and on March 23, 1866, a final settlement of their accounts was made by him. During the pendency of the proceedings one of the sons, Augustus, executed an instrument acknowledging the receipt in full from the executors of his share of the estate, and assigning to his brother William, the executor, any sum that might appear to belong to him on the settlement. On the day of the final settlement William executed a like receipt and assignment to his brother, the defendant, Alexander. It appeared that William had received soon after his father's death $50,000,

Augustus some three years later $59,845.42 and Alexander on the settlement of the surrogate $77,115.77; $48,138.83 was also transferred to the defendant Alexander as the trust fund to be held for the daughter. Alexander was appointed her trustee, and had been appointed guardian for the plaintiff (the granddaughter) in her proceedings before the surrogate.

*Held,* that as it appeared that the estate of the testator was at the time of his death of the value of about $200,000, one-fourth of which would be $50,000, the fact that Alexander received upon the settlement the sum of $77,115.77 as his distributive one-fourth share, established conclusively, as against him, that one-fourth of the net accumulations from the death of the testator to the time of the settlement was at least equal to what he received in excess of $50,000.

That as it was to be presumed that the accumulations as well as the original capital was divided proportionately between the distributees, the same proportion of the trust estate was to be considered as consisting of accumulations as existed in the case of his legacy.

That as the accumulations upon his share amounted to $27,115.77, the accumulations upon the trust estate was to be estimated in a a like proportion on the fund of $23,138.83, that being the difference between $48,138.83, the entire trust fund, and the $25,000 thereof of which the mother Georgiana was to have the income.

That as this sum had been accumulating during the fourteen years that had elapsed from the death of the testator to the time of the settlement, and as the plaintiff was not born until five years after the death of the testator, she was entitled to receive only nine-fourteenths of the said accumulations.

Upon the accounting of the defendant in these proceedings it appeared that he had habitually disregarded his duty. He kept no separate trust fund, but mingled the trust property with and used it as his own. He entirely ignored the rights of the plaintiff, had never paid her a dollar and had kept no account with her. The greater part of the account rendered by him consisted of items which he selected from the account which he kept of the payments made to her mother on account of her annuity. In many instances he could not state with any degree of exactness or certainty what he had received or expended on the plaintiff's account.

*Held,* that all charges not supported by vouchers or other satisfactory evidence should be disallowed.

That such of the items selected from the accounts rendered to the mother as were so supported, and as were not shown by opposing evidence to be incor-rect, should be allowed.

That he was properly charged with interest at the rate of seven per cent per annum, to be computed with annual rests.

That as it did not appear that there was any income in his hands at the time of making the various advances, he should be allowed interest on his disburse-ments in stating the account at the end of each year.

That as an accounting upon the basis above indicated would make the plaintiff good, so far as her rights were made to appear, the defendant was entitled to his commissions.

That such commissions should be deducted at each annual rest.

CROSS-APPEALS from a final judgment, entered on a decision of the court rendered upon a trial at the Chautauqua Special Term.

*Smith & Fisher* and *R. P. Marvin*, for the plaintiff.

*Abner Hazeltine* and *W. F. Cogswell*, for the defendant.

SMITH, P. J.:

This action was brought to obtain a construction of the will of Nathaniel A. Lowry, deceased, and to compel the defendant, as trustee, to account for certain accumulations under the provisions of said will that had come into his hands. The testator died 20th February, 1852, leaving an estate, real and personal, of the value of about $200,000. He gave by the first seven paragraphs of his will several minor legacies, among which were an annuity of $100 to Therina Hall, and the annual interest of $2,000 to Lydia Hall. By the eighth paragraph he gave one-fourth of the residue of his estate to each of his sons William H., Augustus N. and Alexander M., the defendant. By the ninth paragraph he directed that the remaining fourth and the income thereof should be invested by his executors during the natural life of his only daughter, Georgiana Elizabeth, except that the income of $25,000 thereof should be paid to her semi-annually, and in case of her death without issue, the said fourth was given to the testator's said sons in equal shares, but if she died, leaving lawful issue, then said fourth was given to such issue. At the time of her father's death the said Georgiana was about fourteen years old. In 1855 she intermarried with Thomas Cook, and on the 25th March, 1857, the plaintiff was born of that marriage, and she is the sole issue of the said Georgiana. The will named as executors, Richard P. Marvin, Madison Bunnell, Augustus F. Allen and William H. Lowry, one of the testator's sons. Judge MARVIN renounced, and the other executors took out letters. At the time of the death of the testator, all of his children except William H. were minors. The defendant, Alexander M. became of age about the 1st of July, 1865. Shortly thereafter, the executors commenced proceedings before the surrogate of Chautauqua county, for a final settlement of their accounts; and a final decree, or rather a final statement of accounts was made therein by the surrogate on 23d March, 1866. Pending those proceedings

Augustus executed an instrument acknowledging full receipt from the executors of his share of the estate, and assigning to William any sum that might appear to belong to him on the settlement. On the day when the final statement was made William executed a like instrument, acknowledging full receipt from the executors of his share and assigning to Alexander all the interest assigned to him by Augustus, and also all his own residuary interest in the estate (if any) by reason of the death of any legatee or otherwise. The final statement made by the surrogate recited that William had received $50,000, Augustus $59,845.42 and Alexander, $77,115.77 in full of their respective shares in the estate, and that there remained in the hands of William, who had been the acting executor, the sum of $51,567.33, of which, after investing sufficient to raise the annuities bequeathed to Therina and Lydia Hall, there remained $48,258.83 which, as the decree states, "by the terms and conditions of the said will is invested for the benefit of the said Georgiana and her heirs." Thereupon, the executors were declared to be discharged. On 22d May, 1866, by an order of this court, Alexander M. Lowry was appointed trustee of said fund, on his filing a bond as required by the order, which he did on the third of December, following. Therina Hall died August 23, 1873. Lydia Hall is still living. This action was commemced in the spring of 1875, and in May of that year a trial of the action was had at Special Term, and the court found the facts above stated, and also that the said sum of $48,158.83, mentioned in the surrogate's decree, was made up entirely of moneys arising from the estate of said testator, and that no part of it consisted of accumulations; that William received his share of the estate soon after his father's death, and Augustus received his share about three years after that event. The court also found, as matter of law, that the trust created by the ninth clause of the will is valid; that the direction to accumulate the fund mentioned in that clause, that is to say, so much of said fund as exceeds the sum of $25,000, the income of which latter sum is directed to be paid to Georgiana, is void; that such accumulation belongs to the plaintiff as the person presumptively entitled to the next eventual estate, and her right to it commenced at her birth. And that one fourth of the principal sum invested to raise the annuity of $100 for Therina Hall belongs to the fund created by the ninth clause of

the will, and the other three-fourths belong to the defendant Alexander, in his own right and as the assignee of his brothers; and the court sent the case to a referee to take and report an account of said fund and its accumulations. An interlocutory judgment was entered to that effect. The referee took an account and in July, 1879, he made his report. Each party excepted to the report, and in November of that year the cause came on to be heard at Special Term on the referee's report and the exceptions, and a final judgment was entered from which each party has appealed. The appeals bring up for review the interlocutory judgment and several intermediate orders, as well as the final judgment.

It is undoubtedly true, as is conceded by the counsel for each party to this appeal, that the trust created by the ninth paragraph of the will is valid, and the direction for the accumulation of the fund set apart by that paragraph, beyond the sum of $25,000, is void because not limited to the minority of any person in being at the death of the testator. (1 R. S., 726, § 37; Id., 773, § 3.)

The principal question in the case is as to the devolution of the void accumulations. Do they, or so much of them as have accrued since the birth of the plaintiff, go to her as the person presumptively entitled to the next eventual estate (the gift of the principal, to wit, the one-fourth of the residue of the estate, being to her mother Georgiana, and her lawful issue), or do they go to the heirs of the testator as property in respect to which he died intestate? The gift, it will be observed, is of one-fourth of the residue of the testator's real as well as personal estate, and if the accumulations referred to consist to any extent of the rents and profits of real estate, they belong to the plaintiff by force of the provisions of section 40 of the article of the Revised Statutes entitled "Of the creation and division of estates." (1 R. S., 726, § 40.) The case has been argued before us, however, on both sides, as if the accumulations consisted exclusively of the income of personal property, and it may be that the voluminous appeal book before us contains evidence that such is the fact, but our attention has not been directed to it, and we have not discovered it. Nevertheless, we follow the counsel in that respect, and in dealing with the question under consideration, we assume the fact to be as assumed by them. It is provided by the first section of the title of the Revised Statutes

relating to "Accumulations of personal property, and of expectant estates in such property," that the absolute ownership of personal property shall not be suspended for more than two lives, etc. (1 R. S., 773, § 1.) The second section then provides that "in all other respects, limitations of future or contingent interests in personal property shall be subject to the rules prescribed in the first chapter of this act, in relation to future estates in lands." (Id., § 2.) The chapter referred to includes the article respecting the "creation and division of estates," above cited, but the contention of the defendant's counsel is that it does not include the fortieth section of that article. The question was decided adversely to his contention by the Court of Appeals in *Kilpatrick* v. *Johnson* (15 N. Y., 322). That decision was cited approvingly by COMSTOCK, C. J., in *Gilman* v. *Reddington* (24 N. Y., 19), and it seems to have been followed in *Schettler* v. *Smith* (41 N. Y., 328, opinion of GROVER, J., 340, 341), and in *Manice* v. *Manice* (43 N. Y., 303, opinion of RAPALLO, J., 383, 384, 385). The question was decided the same way by Chancellor WALWORTH in *Haxtun* v. *Corse* (2 Barb., Ch. 506, 518), and by the Supreme Court in the third department, in *Robison* v. *Robison* (5 Lans., 165). We should regard these cases as decisive were it not that the learned counsel for the defendant has contended, in an elaborate argument, that they are balanced, if not outweighed, by other cases which he cites, and that the question is an open one, and, upon a proper construction of the statute, should be decided the other way. The counsel cites *Vail* v. *Vail* (4 Paige, 317), *Phelps* v. *Pond* (23 N. Y., 69), and *Hull* v. *Hull* (24 Id., 647). Vail's case was decided in 1834, and appears to be the earliest reported in which the question arose. The question does not appear to have been much discussed by counsel. The chancellor expressed his regret that he was compelled to decide the important principle involved in it with so little aid from counsel (opinion, p. 330), and he evidently reached his conclusion with much doubt as to its correctness. " I have arrived at the conclusion," he says, "from the best lights I have been able to obtain " (p. 331), but it is to be noted that he does not refer to section 2, above cited. And in the subsequent case of *Haxtun* v. *Corse* (*supra*), decided by him, he does not refer to *Vail* v. *Vail*. The counsel for the defendant says the question was not involved in Haxtun's case, but in that he

is in error. It is true there were other questions in that case, but
the question now under consideration was also directly involved,
and was discussed and passed upon and the case is an authority
upon that question as well as upon the other points decided. The
view taken by the counsel would strip every case, involving two
or more distinct questions, of all authority as an adjudication upon
either question. The case of Haxtun is referred to as an authority upon
the point by DENIO, C. J., in *Kilpatrick* v. *Johnson* (*supra*, 327),
and by SELDEN, J., in *Phelps* v. *Pond* (*supra*, 83). In *Phelps* v.
*Pond*, the question was not decided, but Judge SELDEN remarked,
that in the prior cases the question does not appear to have
received much consideration, and "as an original question, it
would admit perhaps, of considerable doubt." In *Hull* v. *Hull*
(24 N. Y., 647), the point was decided, but it was not dis-
cussed. WRIGHT, J., who expressed the views of the court, merely
said that, as to the void accumulations, "the decedent is to
be regarded as having died intestate." None of the preceding
cases are referred to. The judgment of the General Term was
affirmed, but whether the question was carefully considered by that
court we are not informed. Upon a review of the cases we think
the weight of authority favors the conclusion reached by the
learned judge at Special Term, but there is such an apparent want
of harmony in the reported cases that the defendant's counsel has
very properly argued the question as an open one, and as such we
will consider it.

The first article above referred to relates to estates in lands exclu-
sively and prescribes rules for the limitation of future estates in
lands; and section 2 of the title above mentioned respecting accumula-
tions of personal property subjects limitations of future or contingent
interests in personal property to the same rules as limitations of future
estates in lands. (*Per* COWEN, J., in *Kane* v. *Gott*, 24 Wend., 641;
opinion, 662.) Chief Justice DENIO, in *Graff* v. *Bonnett* (31 N. Y.,
9), defined a limitation thus: "The term used in the law of real
estate to denote the act of prescribing by deed or will the commence-
ment, the duration and the termination of such (future) estates, is
the *limiting* them, and the completed act by which they are thus
created is called a limitation; and," he proceeds to say, "one or the
other of these words is used in that sense in nearly every one of

the thirty-five sections included in my quotation" (referring to sections 7 to 42 inclusive, of said first article). "These," he says further, "are the rules which, by section 2 above mentioned, are attached to limitations of future and contingent interests in personal property." (Opinion p. 18.) Sections 37 to 40 inclusive, relate to accumulations of rents and profits of real estate, but it is a mistake to suppose, as does the counsel for the defendant, that they are foreign to the subject of the limitation of future estates. On the contrary, they all relate to accumulations directed to commence on the creation of a future estate or subsequent thereto, and section 40 relates especially to rents and profits undisposed of, and for the accumulation of which no valid direction is given, during a suspense of alienation caused by a valid limitation of an expectant estate. These several provisions respecting accumulations are applied by section 2 to limitations of future interests in personal property, except so far as is otherwise provided in the title of which section 2 is a part.

What has been said seems to answer sufficiently the contention of the counsel for the defendant, that section 40 cannot be characterized as a rule for the limiting of a future estate, and that it is simply a rule concerning the ownership of the rents and profits of real estate. But it may be further remarked, that by section 36 of the same article dispositions of the rents and profits of lands, to accrue and be received subsequent to the execution of the instrument creating such disposition, are made subject to the rules established in said article in relation to further estates in lands. And, in *Kilpatrick* v. *Johnson* (*supra*), DENIO, C. J., speaks of section 40 as a provision "in regard to estates in land." (Page 326.)

The learned counsel assumes that the provisions of sections 3, 4 and 5 of title 4 are the same in meaning and effect as sections 37, 38 and 39 of article 1, and it is not to be supposed that the revisers thus repeated themselves, and hence it is further to be concluded that if sections 37, 38 and 39 are not embraced by section 2, section 40 is not, as the four sections relate to one subject and are inseparable. The fault of the argument is in the premise. Sections 3, 4 and 5 are not identical with sections 37, 38 and 39. The essential difference between them will be seen by referring to the provisions prescribing the periods during which the ownership

of personal property and the power of alienating real estate may, respectively, be suspended. The ownership of personal property cannot be suspended for a longer period than two lives. (1 R. S., 773, § 1.) The power of alienation of real estate may be suspended for two lives and a minority. (Id., 723, §§ 15, 16.) Turning again to the provisions respecting accumulations it will be seen that if an accumulation of the income of personal property be directed to commence at any period subsequent to the date of the instrument, or subsequent to the death of the person executing such instrument, it must be directed to commence within the time allowed for the suspension of the absolute ownership of personal property (1 R. S., 773, 774, § 3, sub. 2), while an accumulation of the rents of real estate, if directed to commence subsequently to the creation of the estate out of which the rents are to arise, shall commence within the time permitted for the vesting of future estates in lands. (Id., 726, § 37, sub. 2.) This distinction is very clearly pointed out by RAPALLO, J., in the case of *Manice* (*supra*, 382, 383). We are of the opinion that the decision of the learned judge at Special Term upon this branch of the case should be affirmed.

We also concur with the trial judge in holding that the plaintiff from her birth was entitled to the accumulations of income, and that on the death of Therina Hall, one-fourth of the capital sum, to the income of which she was entitled during her life, fell into the trust fund created by the ninth paragraph of the will.

The remaining questions in the case relate to the accounting. The accounts rendered by the defendant are very unsatisfactory. In his conduct as trustee he habitually disregarded his duty. He kept no separate trust fund. He mingled the trust property with his own and used it for his own profit. In short, he managed the estate as if he owned the whole of it (instead of three-fourths) subject only to the annuities charged upon it by his father's will. From the beginning of his trust he ignored altogether the rights of the plaintiff as a *cestui que trust*, until he was called to account, and since the commencement of these proceedings he has not paid her a dollar. He has never kept an account with the plaintiff. He kept an account of payments made to or for Georgiana, the plaintiff's mother on account of her annuity, and the only account with the plaintiff which he rendered in these proceedings, was made out

by him in great part by selecting certain items included in the account with her mother, and charging the plaintiff with such of them or such proportion of them as he saw fit. In many instances the items so charged were unsupported by vouchers or by any evidence whatever, except the defendant's recollection or impression. One of the uses to which he devoted the trust funds in common with his own was the buying of real estate mortgages at less than their face. He has rendered no account of the profit thus made. He has not even rendered an interest account. From this statement it is apparent that the attempt to obtain from the defendant an account of his dealings with the trust fund, was almost literally a groping in the dark and it was rendered ineffectual to a great extent by the fact that the trustee would not or could not in many instances state with any degree of exactness or certainty what he had received or expended on the plaintiff's account. This condition of things is to be borne in mind in dealing with the questions arising on the accounting.

The plaintiff excepts to the mode of stating the account as directed by the Special Term in a single particular. The trustee is charged with interest at annual rests, the interest beginning to run on 23d March, 1866 (that being the day when the executors were discharged, and the fund having come into the defendant's hands in the condition it was in on that day). For convenience the first rest is made on the 1st January, 1867. The trustee is credited with the disbursements made by him in the meantime, amounting to less than the interest charged to him, and he is also credited with interest on each of the disbursements. To this allowance of interest the plaintiff objects and cites the case of *King* v. *Talbot* (40 N. Y., 76). There the advances on which interest was allowed to the trustees were made before they received any income from the trust funds (p. 93), and the rule was there laid down that advances for support without income in hand should bear interest, advances for support with income in hand should not bear interest. (P. 94.) Although it appears in this case that the income received by the trustee prior to 1st January, 1867, largely exceeded the disbursements made by him prior to that date, there is nothing to show that any part of such income was received by him before the disbursements were made. For this reason the rule laid down in *King* v.

*Talbot* does not aid the plaintiff, and her third exception to the findings is therefore disallowed.

The plaintiff excepted to the allowance of certain items charged by the defendant as disbursements made by him on the plaintiff's account from April, 1866, to May, 1875, during which time she was at school with Dr. Gallup at Clinton, except in vacations. She was between nine and ten years of age when she went away to school. It has been said already that the defendant kept no account with the plaintiff. That was the case even when she was away from her mother and at school. His account now presented against her is made up, as has been said, by selecting items from the account kept with her mother. In that account certain items were designated as furnished to the plaintiff. We think all the items of that description embraced in the exception are properly allowed, except such as are shown by opposing evidence to be incorrect. But items charged to the mother in the account, not shown by vouchers or other proof, beyond the surmise of the defendant, to have been for disbursements made on the plaintiff's account, should not be allowed against her. So, also, items not charged at all in the account with the mother, and not supported by vouchers or other satisfactory evidence, should be disallowed. The defendant's testimony in regard to particular items evidently consists largely of vague impressions, and so far as it is unsupported by the account which he kept at the time, or other evidence, it should not be received to charge the plaintiff, especially in view of his adverse interest growing out of the fact that he, in his own right and as the assignee of his brothers, will probably be entitled to what may remain of the trust fund in case he survives the plaintiff and her mother. Applying these rules to the items covered by the plaintiff's second and fourth exceptions to the findings of the court (which are the same in effect as his fifth and sixth exceptions to the report of the referee), the following items allowed by the Special Term should be disallowed, to wit: The items of "Ann Smith, sewing, $9.51; Mrs. Lathrop, sewing, $84.73; cash, August 5, 1868, $50; June 10, 1869, $10; September 2, 1869, $25; July 7, 1871, $20; July 27, 1872, $8; August 5, 1872, $20; August 6, 1872, $12; September 6, 1872, $10, and June 23, 1873, $5," neither of said items appearing in said account, or, if appearing there, not being designated therein as fur-

nished to or for the plaintiff. Also the items : " Comstock, B. & B., dry goods, $67.77 ; Defendorf & Co., dry goods, $143," and " Wild & Keeler, drv goods, $57.67," each of which appears in the account, but is not designated as purchased for the plaintiff, although other items in near proximity to them in the account are so designated. We have not discovered from the case that vouchers were produced for either of the foregoing items, except the first ; and as the voucher given in that instance does not appear in the case there is no evidence that the payment was on the plaintiff's account.

We have said that we think all the items designated in the account kept with the mother, as furnished to or for the plaintiff, were properly allowed to the defendant, except such as were shown by opposing evidence to be incorrect. The latter remark applies to the items of cash paid to Dr. Gallup so far as they are controverted by Dr. Gallup's testimony. The difference between the defendant and Dr. Gallup is some $250, and it occurs mostly in the three items next preceding the last item in the account. Without going over the evidence on the subject at large, it suffices to say that an examination of it leads us to the conclusion that Dr. Gallup's version of the matter is correct. The exceptions last referred to are allowed.

A question of much importance is raised by the plaintiff's first and fifth exceptions to the findings of the Special Term, to wit, whether any part of the sum of $48,138.83, mentioned in the surrogate's decretal statement, consisted of accumulations. The importance of the question arises from the fact that the plaintiff was entitled to receive, at the time of the settlement, all accumulations that had accrued since her birth, on the principal sum, the income of which belongs to her. Our attention has not been called to any direct evidence in the case bearing upon the question one way or the other. We have not discovered any proof that an inventory was ever filed, or that there was any showing before the surrogate of the nature of the assets of the estate, except such as were then set apart as the trust fund under the ninth clause of the will. Indeed, the proceeding before the surrogate, instead of being an accounting on the part of the executors by items, was a settlement between them and the defendant whereby the executors were released from further liability, the defendant's two brothers having accepted certain sums of money for their interests, which were

thereupon transferred to the defendant, and whatever remained of the estate was turned over to him. Of that remainder, he took to himself the sum of $77,115.77 as his distributive share, and certain assets of the nominal value of $51,567.33, of which $3,139.53 turned out to be worthless, were selected and set apart (by what method or rule of selection does not appear) as a trust fund for the unpaid female beneficiaries, minor and adult, whom the testator had provided for in his will. In that proceeding the defendant appeared as the guardian of the plaintiff.

But there is evidence in the case justifying certain inferences as to the fact of accumulations, and their amount. The estate left by the testator was of the value of $200,000. The complaint alleged, and the court found that one-fourth of it amounted to $50,000 or more. As there is neither allegation, proof or finding that it exceeded that sum, the value of the estate must be assumed to be as above stated. At simple interest the estate would have nearly doubled in fourteen years, if nothing had been paid out. That its gross accumulations were more than fifty per cent of the capital, is shown by the fact that the sums with which the executors were credited in the settlement before the surrogate, including distributive shares, exceeded $306,000. The fact that on the settlement, the defendant received $77,115.77 as his distributive share, after all debts and expenses had been paid, and all legacies had been paid or provided for, seems to be very conclusive evidence, as against him, that one-fourth of the net accumulations was, at least, equal to what he received in excess of $50,000. The sum above stated was received by him as his share as a legatee, as appears by the surrogate's statement, and his share was one-fourth of the estate. It is true the assignments from his brothers transferred to him any contingent interests in the estate which might thereafter accrue to them, by the death of any legatee or otherwise, but it does not appear that any such interest had accrued to either of them, at the time of the settlement. Each of them had been paid his one-fourth of the estate, William H. having received $50,000 therefor soon after his father's death, and Augustus N. about $60,000 three years later. The amount paid to the latter, ratified as it was by the defendant in the subsequent settlement, is evidence that at the time of such payment the net accumulations of the estate were, in round num-

bers, $40,000. How it happened that the one-fourth of the estate received by the defendant on the settlement so far exceeded that which was set apart for the beneficiaries under the ninth clause of the will, who were also entitled to one-fourth, does not appear, and perhaps it is not now material to inquire. But as his share and theirs were undivided up to that time, it is to be presumed that the accumulations, as well as the original capital, were divided proportionately at least, if not equally, between them. That much, certainly, was due to the plaintiff, she being then presently entitled to her share of the accumulations accrued since her birth, and as the defendant had assumed the duty of looking after her interests on that occasion, it is to be presumed that he took care that her share of the accumulations was included in the fund set apart for her benefit. The process for ascertaining the amount of accumulations so included is obvious from the foregoing statement. Of the amount received by the defendant as his distributive share, to wit, $77,115.77, the sum of $27,115.77, as we have seen, consisted of net accumulations. Applying that proportion to the remainder of the trust fund ($23,138.83) — i. e., $48,153.83 less $25,000 — the product is the amount of accumulations contained therein. But the sum thus obtained is the amount of accumulations during the fourteen years that elapsed after the death of the testator to the time of the settlement before the surrogate. As the plaintiff was not born until five years after the death of the testator, nine-fourteenths only of the sum ascertained as aforesaid, is the amount which she is now entitled to have paid to her out of said sum of $23,138.33.

In ascertaining the amount of such accumulations, no notice need be taken of the fourth of the "Therina Hall" principal, as it has been taken into the account as of the date of her death ; it must be added, however, to the principal sum remaining in the hands of the trustee for the benefit of the plaintiff, and no abatement of taxes is required, as they have all been allowed to the executors or the trustee:

The learned counsel for the plaintiff has suggested another formula for ascertaining the amount of accumulations, which is, to deduct from the $23,183.33 a sum which, at compound interest for nine years, will produce the $23,183.33, and the remainder will be the amount of the accumulations for the nine years. But that rule

assumes that the whole estate was kept invested at such rates as to produce seven per cent interest, and that the interest was promptly collected and invested at like rates. Of that there is no proof, and it will hardly do to decide this question against the defendant upon the presumption of such unusual diligence on the part of the executors.

We think that under the circumstances of the case the defendant is properly charged with interest at seven per cent with annual rests. The interest accrued prior to the recent statute reducing the rate of interest to six per cent. We agree that it is only in cases of gross negligence and disregard of duty on the part of trustees that a rule so severe should be imposed, but in our judgment this is such a case. The facts already stated seem to us to justify that conclusion. We know of no precedent that forbids the rule adopted at Special Term. The case of *Walker* v. *Woodward* (1 Russ., 107) seems to be a precedent for it. There the husband of an administratrix had carried on a farming business with the assets of the intestate, and in his answer he admitted that he had made a profit, but as he had kept no accounts and had blended the transactions of the farm with his other concerns he could not set forth the amount of the profits. The account was ordered to be taken against him with annual rests, and interest at five per cent (the highest rate in England) on those annual rests. The case is cited in Hill on Trustees (page *523), from which the above statement of the decision is taken.

The Special Term denied the defendant commissions and he excepted. An accounting upon the basis herein above indicated will make the plaintiff good so far as her rights are made to appear, and that being the case we think the defendant is entitled to commissions. In *Meacham* v. *Sternes* (9 Paige, 398), the chancellor allowed a trustee commissions on sums with which he was charged in consequence of losses arising from his negligence. And in *King* v. *Talbot* (*supra*), Judge WOODRUFF said that "even in cases of misconduct or gross negligence it is at least doubtful whether the settled rule in this State would not require the allowance of commissions." (P. 96.) We think, also, the defendant is entitled to have his commissions deducted at each annual rest. (*Vanderheyden* v. *Vanderheyden*, 2 Paige, 287.)

We accordingly modify the judgment appealed from in the respects

above indicated, and direct that the account be restated in accordance with the views above expressed. As suggested by the plaintiff's counsel in his printed brief, the plaintiff's attorneys are directed to restate the account as herein ordered, and to serve a copy on the defendant's attorneys, and in case of difference between them the judgment may be brought on for settlement before Mr. Justice BARKER, by either party upon five days' notice to his adversary

The plaintiff is allowed costs of this appeal against the defendant personally.

HARDIN, J., concurred.

Present — SMITH, P. J., and HARDIN, J.

Ordered accordingly.